MICHAEL W. FOSTER (State Bar No. 127691)
mfoster@fosteremploymentlaw.com
MADELYN G. JORDAN-DAVIS (State Bar No. 181771)
mjd@fosteremploymentlaw.com
C. CHRISTINE MALONEY (State Bar No. 226575)
cmaloney@fosteremploymentlaw.com
FOSTER EMPLOYMENT LAW
3000 Lakeshore Avenue
Oakland, California 94610
Telephone: (510) 763-1900
Facsimile: (510) 763-5952

BARBARA PARKER, City Attorney (State Bar No. 069722)
RANDOLPH W. HALL, Chief Assistant City Attorney (State Bar No. 080142)
VICKI A. LADEN, Supervising Deputy City Attorney (State Bar No. 130147)
CHRISTOPHER KEE, Deputy City Attorney (State Bar No. 157758)
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-7686
Facsimile: (510) 238-6500

Attorneys for Defendants,
CITY OF OAKLAND, HOWARD JORDAN
and SEAN WHENT

FOSTER employmentlaw
3000 Lakeshore Avenue
Oakland, California 94610

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCSICO DIVISION**

| | |
|---|---|
| DERWIN LONGMIRE,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF OAKLAND, HOWARD JORDAN, SEAN WHENT, and DOES 1-50, inclusive,<br><br>Defendant. | Case No. C 10-01465 JSW<br><br>(42 U.S.C. §§ 1981 and 1983)<br><br>**DECLARATION OF HOWARD JORDAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>**Date: December 9, 2011**<br>**Time: 9:00 a.m.**<br>**Dept: Courtroom 11, 19th Floor**<br>**Judge: Hon. Jeffrey S. White**<br><br>Date Action Filed: April 7, 2010<br>Trial Date: February 27, 2012 |

I, Howard Jordan, declare as follows:

1. I am employed as the Assistant Chief of Police for the Oakland Police Department ("OPD"). I have worked as a police officer in Oakland since August 1988. In January 2006, I was promoted to Deputy Chief of the Bureau of Investigations. Then, on July 1, 2007, I was promoted to the rank of Assistant Chief of Police, overseeing all of the Bureaus. I have personal knowledge of the following facts and am competent to testify about them.

2. On February 28, 2009, following the resignation of Chief Wayne Tucker, I was appointed Acting Chief of Police. I served in that capacity until October 19, 2009, when Anthony Batts was hired as the Chief of Police.

3. On August 2, 2007, Chauncey Bailey ("Bailey") a journalist in Oakland was shot to death while walking to work. Sgt. Derwin Longmire was assigned to lead the investigation for the Department. That same day, OPD learned that Bailey had been working on a story involving the Bakery. In addition, a tracking device that the Department had previously placed on Bey IV's car revealed that Bey IV's car had been parked outside Bailey's home the night before the murder and was at the scene of the murder within 20 minutes after it occurred. Upon OPD learning this information, Bey IV became a suspect in the Bailey homicide.

4. On August 3, 2007, OPD conducted a massive pre-planned raid on the Bakery in conjunction with criminal investigations of Bakery members. The shotgun used to kill Bailey and other evidence was recovered in the raid. Bey IV, Devaughndre Broussard, and others were taken into custody on a variety of charges. During the custodian interrogation process, Longmire allowed Bey IV and Broussard to speak alone, without recording or monitoring the conversation. After several minutes alone with Bey IV, Broussard confessed to killing Bailey and claimed he acted alone.

5. I learned from media accounts that Broussard's attorney, La Rue Grim, publicly challenged the confession, contending that it was coerced. Grim apparently then released Longmire's homicide investigation file to the media. As a result of the file's release, Longmire and the Department came under intense media scrutiny for the quality of the Bailey investigation and

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

for Longmire's relationship with Bey IV.

6. In February 2008, the CBS news program "60 Minutes," ran a story on the Bailey homicide. I appeared on the program as the spokesperson for OPD. During that appearance, the reporter asked about Longmire's relationship with Bey IV. In response to his inquiry, I explained that, "I don't have any problem with Sgt. Longmire's relationship with members of the Bakery…I trust his integrity, I trust his credibility…." In the months that followed, the Department continued to be subjected to intense media scrutiny. In November 2008, in an effort to address the misinformation that appeared in the press, I authorized the release of a detailed letter that set out all of the reasons that the Department (up to that point) did not believe that Longmire had compromised the Bailey investigation. Attached hereto as Exhibit A is a true and correct copy of that press release that I authorized although I recall that the press only printed a portion of this letter.

7. In April 2008, Officer Jessie Grant raised concerns to my attention regarding possible misconduct by Longmire. I was obligated, pursuant to Department policy, to initiate an internal affairs investigation into Longmire's alleged improper conduct. In the fall of 2008, Chief Tucker decided to have an outside consultant complete the Departments Internal Affairs ("IA") investigation. Shortly thereafter, OPD contracted with Wendell "Pete" France to complete the IA investigation. At or around the same time, I became aware that former Oakland Mayor Ron Dellums requested that the California Department of Justice ("DOJ") conduct a concurrent investigation of OPD's handling of the Bailey murder investigation. I did not participate in directing either the France or the DOJ investigations. I did not discuss investigation strategies or identify witnesses for their investigations.

8. In February 2009, I was interviewed by Special Agent John Porbanic as a part of the DOJ's concurrent investigation. I did not request to be interviewed by Special Agent Porbanic. During the interview, I answered each question fully and to the best of my recollection.

9. By the time of the February interview, I developed concerns regarding Longmire's ability to separate his relationship with Bey IV from his responsibilities as a homicide detective for

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

the City of Oakland. However, I have never believed that Longmire was a Muslim or a member of the Bakery. I did, however, believe that his judgment may have been compromised because of his relationship with Bey IV.

10. In April 2009, OPD received the completed investigations from France and the DOJ. On or about April 13, 2009, I met with then Acting Captain Whent who presented the findings of the investigators. Based on a preponderance of the evidence standard I sustained two findings against Longmire: Compromising Criminal Cases (MOR 370.72-1) and Insubordination (MOR 314.30-1). Thereafter, I placed Longmire on paid administrative leave pending the Department's determination of appropriate disciplinary action. Upon receiving sustained findings of misconduct, I was responsible for recommending appropriate disciplinary action to the City Administrator who then made the final decision on discipline after due process procedures were exhausted.

11. On May 1, 2009, I informed Longmire that I intended to recommend to the City Administrator that Longmire be terminated from his position as a sergeant. Deposition Exhibit 7 is a true and correct copy of the May 1, 2009 letter informing Sgt. Longmire of my decision.

12. In July 2009, Longmire exercised his right to a pre-termination due process Skelly hearing. OPD Captain Anthony Toribio was appointed as the Skelly hearing officer. On July 23, 2009, I met Captain Toribio and discussed Longmire's case. Captain Toribio informed me of his opinion that the IA findings should be changed to "not sustained" and the termination not imposed. I concurred and some time thereafter I informed the City Administrator that I was withdrawing my recommendation for Longmire's termination.

13. Following my meeting with the City Administrator, no final decision was made about Longmire's termination. It was my understanding that the City Administrator would further consider my recommendation before making a final decision about Longmire's termination. I eventually learned that the City Administrator concurred with my recommendation.

14. In or around December 2008, Longmire reached the Department's service cap in an out-of Patrol assignment. Because Longmire served more than ten years outside of the Patrol Division he was required, pursuant to Department policy, to transfer to Patrol for at least one year.

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

Chief Tucker made the final decision to transfer Longmire to Patrol. A true and correct copy of the pertinent portions of the applicable Transfer Policy (Department General Order B-4) is attached hereto as Exhibit B.

15. Longmire's transfer became effective on February 1, 2009. Shortly after Longmire's transfer, Lt. Brian Medeiros, the new Homicide commander, reviewed open files left by officers who had recently transferred out of Homicide. Medeiros identified a number of problems in approximately 10 homicide cases that had been assigned to Longmire and remained open. Medeiros referred the matter to Internal Affairs for investigation and I eventually learned there was a second pending IA investigation regarding Longmire. I did not direct Medeiros or anyone to look at Longmire's open homicide files. The Medeiros IA investigation was still pending when I made the decision to withdraw my recommendation for termination of Longmire on the Bailey IA investigation. Because there was another pending IA, I made the decision to maintain Longmire on paid administrative leave until its conclusion. Eventually, the Medeiros Investigation resulted in sustained findings against Longmire for Performance of Duty. The Department recommended a 20-day suspension for the performance deficiencies identified in the Medeiros Investigation. At that point, I instructed Acting Captain Whent to contact Longmire's attorney to see whether an agreement could be reached on discipline for Longmire prior to his returning to work. The Department and Longmire failed to reach an agreement regarding discipline. Thereafter, Longmire was ordered back to work on December 23, 2009. He served a six-day suspension on the sustained charge in the Medeiros Investigation and received no discipline on the Bailey IA investigation.

16. On or about October 5, 2009, I received a letter from attorney Michael Rains. In that letter, Rains memorialized some of the negotiations that previously transpired between the parties on the resolution of discipline. In addition, Rains complained that Acting Captain Whent engaged in misconduct while communicating with law enforcement officials in Contra Costa County. After reviewing that letter, I referred Rains' complaint to IA.

17. My race is African American.

18. Longmire's race did not play any role in my decision to recommend his termination on

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

the Bailey IA investigation. I based my recommendation on the fact that two outside investigators both found evidence of misconduct by Longmire and upon our Department's Discipline Matrix which provides guidelines for the appropriate level of discipline to be imposed for various kinds of misconduct.

19. Based on my experience as a police commander as well as having visited and interacted with other law enforcement agencies in the Bay Area and throughout the United States, I have personal knowledge that OPD is one of the most diverse law enforcement agencies in the United States. When compared to departments of similar size, OPD is the most diverse in terms of its command ranks. For the combined years of 2009 and 2010, OPD promoted four African American males, three Latino males, ten Caucasian males, four Asian males and two African American females to the rank of Sergeant or above. During my tenure as Acting Chief of Police, I participated in the termination of four officers because of misconduct: two Caucasian males, one Latino male, one African-American female. As reflected by this data, I do not treat African American officers more harshly than officers of other races.

20. In April 2009, when Longmire was placed on leave, the Department's practice was to place officers on leave during IA investigations or when there was a sustained finding that could lead to termination of employment. That practice has changed under the leadership of the current Chief, Anthony Batts, who, as a cost savings measure, makes every effort to keep officers at work pending the outcome of the discipline process. However, those officers who have been recommended for discipline are transferred to positions within the Department where there is no risk that they will have contact with the public.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 12th day of August, 2011 at Oakland, California.

HOWARD JORDAN

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

# EXHIBIT A

---

## For the record: The truth about the Chauncey Bailey murder investigation

Recent media reports that accuse the Oakland Police Department of ignoring key evidence in the ongoing investigation of Chauncey Bailey's murder are categorically false.

At the risk of harming the integrity of criminal prosecutions, the Oakland Police Department cannot comment on every aspect of ongoing criminal investigations. However, media reports have badly misconstrued or misunderstood the facts of this case, and we feel that the public deserves to know the truth about the department's handling of this important investigation.

Here are the facts:

Within the first 24 hours of our investigation, it became apparent that members of Your Black Muslim Bakery, including Yusef Bey IV, were involved in the murder of Chauncey Bailey. Within 48 hours of Bailey's murder, we arrested several bakery members, including Bey IV. Members of the Alameda County District Attorney's Office met with the Oakland Police Department to review reports, discuss the facts of the case and participate in interviews of suspects. All of the facts known at the time were presented to Assistant District Attorney Tom Rogers.

Correction #1: Media reports have alleged that Oakland Police Sgt. Longmire withheld data obtained through a GPS tracking device on Bey IV's vehicle. Not true. The GPS tracking data was presented to Deputy DA Rogers on the day Bey IV was arrested. This evidence was not withheld and the reason it did not appear in Sgt. Longmire's report is that he did

not collect it. Another investigator working on a different case focused on Bey IV collected this evidence and his work is documented in his report.

Correction #2: It was alleged that Sgt. Longmire did not collect or analyze evidence regarding Bey IV's cell phone. Not true. Sgt. Longmire prepared two search warrants for Bey IV's cell phone records. He had to wait 30 days for the phone company to provide the records. When this evidence was provided Sgt. Longmire delivered it to the District Attorney's Office. The District Attorney's Office performed its own analysis of this evidence. This is not at all unusual, as District Attorney investigators are frequently assigned to handle tasks related to follow-up investigations.

Correction #3: It was alleged that Sgt. Longmire interfered in other investigations related to Bey IV. Not true. The evidence suggests just the opposite – that Sgt. Longmire attempted to use his familiarity and knowledge of Your Black Muslim Bakery to convince bakery members who were suspects to voluntarily submit to a police interview. The bakery members then refused to cooperate, but we were able to arrest one of the members on a warrant in that case.

The Oakland Police Department respects the charging decisions made by the District Attorney in the Chauncey Bailey case. As the District Attorney indicated in a July press interview, charging Bey IV prematurely at the beginning of this investigation as an accessory could have precluded more serious charges against him in the future. Bey IV is now in custody and facing a possible life sentence in a separate kidnapping/torture case. Devaughndre Broussard, who we believe was Bailey's killer, has been charged with murder. Both the Oakland Police Department and the District Attorney's Office continue to investigate Bailey's murder and to gather evidence to support future prosecutions, including evidence regarding Bey IV's role in the crime.

The Oakland Police Department also respects the rights of journalists to cover and investigate stories of interest and concern to the public. However, we hope that reporters covering this story will not jump to

conclusions without first understanding accepted police interrogation and investigation procedures, and we urge the media to not ignore important facts in their investigation of this case, which is rightfully of great interest to the community.

We welcome the State Attorney General's Office to review the police department's investigation. At the same time, the Oakland Police Department will continue its own Internal Affairs review to make sure this case is handled with the highest level of integrity.

We remain committed to our investigation of the murder of a working journalist on our streets, and to bringing every responsible person to justice.

# EXHIBIT B



DEPARTMENTAL GENERAL ORDER

B-4

Index as:

Personnel Assignments, Selection Process, and Transfers

Effective Date: 1 Jan 09

Evaluation Coordinator: BOS Deputy Chief

Evaluation Due Date: 1 Jul 09

Automatic Revision Cycle: 2 Years

---

## PERSONNEL ASSIGNMENTS, SELECTION PROCESSES, AND TRANSFERS

The purpose of this order is to set forth Departmental policy and procedures to permit members of the rank of Police Officer and Sergeant to transfer to and from assignments in a manner that enhances their professional development and personal growth while adding value to the organization's effectiveness and improved job satisfaction. Additionally, this order describes the knowledge, skills, and abilities that are required to transfer to assignments other than the Patrol Division.

## I. DEFINITIONS AND TERMINOLOGY

A. Applicable Members

This policy applies to all members of the rank of Police Officer and Sergeant of Police classifications.

B. Duration of Assignment ("Cap")

The length of time a member may be in an assignment (For synopsis of Cap lengths by type of assignment, refer to the Transfer Policy Summary Worksheet – Appendix).

C. Exempt Assignment

An assignment that is not subject to a Transfer List (TL) or Order of Merit List (OML) process. Members are selected for such assignments at the discretion of the Chief of Police.

D. Home Base

The principle organizational unit to which both police officers and sergeants are assigned is the Patrol Division, not to include T/L or OML assignments.

J. Transfer

The assignment of a member from:

1. One bureau to another; or

2. From one division to another division within the same bureau.

K. Transfer List (TL)

A list that is developed based on "first-come, first-served" that is utilized to fill out-of-Patrol assignments to which members may wish to transfer. Such out-of-Patrol assignments are not subject to a competitive selection process. TL assignments are detailed in the Transfer Policy Summary Sheet.

## II. POLICY

A. The Chief of Police shall be the final authority regarding transfers of a member to TL, OML, or exempt assignments.

B. The Chief of Police may pass over an eligible member on a TL or OML for reasons that include:

1. The member's skills and abilities do not enable the Department to satisfactorily meet its needs, or

2. The member's past performance deficiencies make the member unsuitable for the position sought.

C. Caps shall apply to newly promoted sergeants in their initial assignment.

D. Members shall return to the Patrol Division after reaching the maximum Cap.

E. A unit commander/manager may extend an assignment until the next Patrol year for members who have an anniversary date falling after 1 Oct.

F. Probationary members (to include sergeants) who are serving their initial assignment in or out of Patrol may not submit a Transfer Request Form (TF-605) until they have successfully completed their probationary period.

G. A member assigned to Patrol may have three (3) active TL or OML requests on file at one time.

**EXCEPTION**: The Chief of Police or designee may approve a transfer of an officer in an out-of-Patrol assignment to another eligible out–of-Patrol assignment within the Cap. The combined Cap of the two (2) assignments shall not exceed eight (8) years[1].

b. A transfer or loan of a member assigned from Patrol to an out-of-Patrol assignment exceeding 90 days shall not be considered as "Patrol Time" for purposes of calculating the minimum "one (1) year in Patrol" rule.

B. Sergeants

1. Initial Assignment After Promotion

Upon promotion to the rank of Sergeant of Police, the member's first assignment shall be at the discretion of the Chief of Police.

2. One (1) Year Rule

a. After reaching the Cap in an out-of-Patrol assignment, sergeants shall be required to complete a minimum of one (1) year in Patrol prior to being transferred to an out-of-Patrol assignment.

**EXCEPTION**: The Chief of Police or designee may approve a transfer of a sergeant in an out-of-Patrol assignment to another eligible out-of-Patrol assignment within the Cap. The combined Cap of the two assignments shall not exceed eight (8) years[2].

b. A transfer or loan of a member from Patrol to a out-of-Patrol assignment exceeding 90 days shall not be considered as "Patrol Time" for purposes of calculating the minimum "one (1) year in Patrol" rule. Exceptions to this rule shall be approved by the Chief of Police.

---

[1] Shall not exceed 10 years if the Homicide Section is the out-of-Patrol assignment that will put the member over the eight (8) year maximum, e.g. if a member is in Homicide for between 8-10 years, the member cannot transfer to another out-of-Patrol assignment. However, if the member is in an out-of-Patrol assignment for four (4) years and gets transferred to Homicide, the member may stay in Homicide for a total of four (4) years plus two (2) one (1)-year extensions (total 10 years).

[2] Same as footnote 1.