MICHAEL W. FOSTER (State Bar No. 127691)
mfoster@fosteremploymentlaw.com
MADELYN G. JORDAN-DAVIS (State Bar No. 181771)
mjd@fosteremploymentlaw.com
C. CHRISTINE MALONEY (State Bar No. 226575)
cmaloney@fosteremploymentlaw.com
FOSTER EMPLOYMENT LAW
3000 Lakeshore Avenue
Oakland, California 94610
Telephone: (510) 763-1900
Facsimile: (510) 763-5952

BARBARA PARKER, City Attorney (State Bar No. 069722)
RANDOLPH W. HALL, Chief Assistant City Attorney (State Bar No. 080142)
VICKI A. LADEN, Supervising Deputy City Attorney (State Bar No. 130147)
CHRISTOPHER KEE, Deputy City Attorney (State Bar No. 157758)
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-7686
Facsimile: (510) 238-6500

Attorneys for Defendants,
CITY OF OAKLAND, HOWARD JORDAN
and SEAN WHENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCSICO DIVISION

| | |
|---|---|
| DERWIN LONGMIRE,<br><br>    Plaintiff,<br>vs.<br><br>CITY OF OAKLAND, HOWARD JORDAN, SEAN WHENT, and DOES 1-50, inclusive,<br><br>    Defendant. | Case No. C 10-01465 JSW<br><br>(42 U.S.C. §§ 1981 and 1983)<br><br>**DECLARATION OF JESSE GRANT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>**Date:** December 9, 2011<br>**Time:** 9:00 a.m.<br>**Dept:** Courtroom 11, 19th Floor<br>**Judge:** Hon. Jeffrey S. White<br><br>Date Action Filed: April 7, 2010<br>Trial Date: February 27, 2012 |

DECLARATION OF JESSE GRANT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

I, Jesse Grant, declare as follows:

1. I was employed as a police officer for the City of Oakland between 1999 and 2008. I have personal knowledge of the following facts and am competent to testify about them.

2. I grew up in Oakland and began my career with the Oakland Police Department ("OPD") at the age of 15 as an Explorer. Thereafter, while attending the University of California at Berkeley, I worked part-time as a Cadet. In January 1999, I was hired as a full-time Officer. I worked for OPD until June 2008, when I resigned. At that point, I felt that my career with OPD was over for having raised concerns internally about Sergeant Derwin Longmire's actions relative to the kidnap torture case I was investigating which involved members of Your Black Muslim Bakery. Since 2008, I have been employed as a police officer with the City of Berkeley.

3. During the last several years of my employment with OPD, I was an investigator with the Special Victims Unit ("SVU") and the Criminal Investigations Division ("CID"). My last assignment was with the Robbery section within the CID. I investigated approximately 800 cases during the six years I was assigned to the SVU and approximately 200 additional cases once I was assigned to the CID. Over the course of my investigations experience, I conducted hundreds of witness and suspect interviews.

4. As an investigator with OPD, I became aware of various alleged criminal activities which involved members of Your Black Muslim Bakery ("the Bakery"). I gained a general understanding that members of the Bakery were suspected of criminal activity which spanned real estate fraud, witness tampering, vandalism, robbery, kidnapping, torture and murder. In 2002, I was peripherally involved in the investigation of Yusef Bey, Sr. with respect to sexual assault allegations made by various women. I came to believe that members of the Bakery were involved in multiple criminal activities and would seek to exploit anyone they could to further their criminal endeavors.

5. On or about May 17, 2007, I was assigned a case involving a kidnapping and torture of two women in the City of Oakland. During that investigation, we discovered evidence that linked the crime to members of the Bakery. In May 2007, I met with then-Captain Loman, head of the CID, to advise him of the case and what I believed to be clear indicators that members of the Bakery

1

DECLARATION OF JESSE GRANT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

could be involved.

6. As part of my investigation, on June 12, 2007, I arranged two out-of-custody interviews with suspects who were known members of the Bakery: Kahlil Raheem and Joshua Bey. While Joshua Bey was on premises on June 12th, I witnessed Sergeant Longmire open the door and stick his head in Bey's interview room. Later that day, I was informed by another officer that Sergeant Longmire also stuck his head in the interview room where Raheem was waiting. I was further informed that Sergeant Longmire had spent approximately 30 minutes, the duration of the Raheem's interview, in the bathroom that shared a wall with Raheem's interview room.

7. Sergeant Longmire worked in Homicide. In the years that I worked in the department, Sergeant Longmire and I rarely crossed paths other than exchanging the occasional greeting in passing. When Sergeant Longmire stuck his head in the interview rooms with my suspects, he had not been working on the kidnapping/torture investigation. Prior to June 12, 2007, I rarely, if ever, saw Sergeant Longmire in the general CID area where I worked. The Homicide unit was located in a separate area from general CID and had its own interview rooms and bathroom. It was rare to see Homicide investigators in our area.

8. Sergeant Longmire's behavior was odd and concerned me. In my experience, it is highly unusual for an officer to enter another officer's interview room without being asked. The act of sticking your head in the door to an interview room, even if nothing is said, can be communicative to a suspect or witness, such as letting that person know you are involved with that particular case.

9. As I continued to work up the kidnapping/torture investigation, I gathered more intelligence regarding the Bakery. I spoke to members of the OPD who investigated crimes involving Bakery members and I reviewed prior OPD case files related to crimes that Bakery members either committed or were suspected of committing. In the course of this intelligence gathering, I reviewed a follow-up report prepared by Officer Dominic Arotzarena in a Bakery-related vandalism case. Based on my review it appeared to me that Sgt. Longmire inserted himself in the vandalism investigation without being asked and to the potential detriment of that investigation.

2

DECLARATION OF JESSE GRANT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

10. On August 2, 2007 journalist Chauncey Bailey was murdered. The following day OPD and several outside agencies served two search warrants on the Bakery. On or about August 6, 2007, I transported Yusef Bey IV and two other kidnapping/torture suspects to the police station in San Leandro. While in the San Leandro police station, we left all three kidnapping/torture suspects in a room with both video and audio recording. During the period that the suspects were left alone they talked about their involvement in various crimes. Bey IV smugly discussed his knowledge of the Chauncey Bailey murder and the location of the gun used to kill Bailey. In addition, during that discussion, Bey IV bragged that he was not being charged in that case because of Sergeant Longmire. I provided then Capt. Loman, the head of CID, with a copy of the tape, as well as, others who requested it within the Department.

11. In or around September 2007, I approached Captain Loman and spoke to him about my concerns that Sergeant Longmire had close connections to Bakery members. When I approached Captain Loman, it was my hope that he could speak with Sergeant Longmire and that the matter could be handled informally. I wanted Sergeant Longmire to stay away from my case and I wanted Captain Loman to be aware of what I perceived as a potential conflict. During my discussion with Captain Loman, he became visibly upset with me, in that he raised his voice and reprimanded me for failing to discuss the matter with Sgt. Longmire. Thereafter, Sergeant Longmire no longer returned my hallway greetings and stared me down when we passed each other. By raising these concerns to the head of the CID and experiencing the response I got, I became concerned because Loman did not handle these issues formally or informally yet it seemed he had clearly communicated my concerns to Longmire. This coupled with Joyner's actions lead me to believe I was no longer welcome in Homicide and if I were to go there I would not have been placed into a situation in which I would have been allowed to be successful.

12. In December 2007, I served a search warrant in a Bakery-related victim intimidation case. After executing the search warrant, we took the suspect back to the Robbery section. Because we did not want anyone to interact with the suspect, Officer Shaun Johnson stood in front of the room to prevent anyone from entering. Officer Johnson later informed me that while he stood guard

3

DECLARATION OF JESSE GRANT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Sergeant Longmire paced back and forth in front of the room approximately 8 times. When I relieved Officer Johnson at the door I personally saw Sergeant Longmire walk back and forth in front of the door to the interview room.

13. Several times during my investigation of the Bakery kidnapping/torture case, Sergeant Longmire approached me about returning evidence seized in the August 2007 Bakery raid to Alaia Bey, common law wife to Yusef Bey IV. Although I spoke to Alaia Bey several times and informed her that I would not release cell phone equipment, Sergeant Longmire continued to approach me. I told Sergeant Longmire on several occasions that I would not be returning the property and that I informed Alaia Bey of this fact. Nonetheless, on one occasion when I was in the Homicide unit, Sergeant Longmire picked up the phone, dialed it, and handed me the receiver without any warning. Alaia Bey was on the other end of the phone. I found it disconcerting that Sergeant Longmire continually insisted that I speak to Alaia Bey about the cell phones when he knew my position on this and that I had communicated my position to Bey.

14. In February 2008, Sergeant Longmire approached me on at least two occasions about the return of a computer that had also been confiscated from the Bakery during the August raid. On one occasion he was adamant that I return the property to the Bakery and was physically pointing his index finger at my chest. He told me he had told Alaia Bey there was no reason for me to still have the computer and I should release it. We were in close proximity and he was telling me what I needed to do. At some point, I told him to speak to Sergeant Lou Cruz because I believed the computers may have been technically logged into evidence under his Bakery-related murder investigation. I felt Sergeant Longmire was trying to intimidate me.

15. In February 2008 a letter was intercepted from Yusef Bey IV while he was in custody. As a part of my investigation into the kidnapping/torture case, I received and reviewed a copy of Bey's correspondence. In the letter the word "IMPORTANT" was handwritten in capital letters at the top of the page. On that page, Bey IV asked the Chief of Security for the Bakery to contact Sergeant Longmire. Bey described Longmire as "a good friend an[d] supporter of my father…" In addition, he asked the Chief of Security to ask Sergeant Longmire about the

4

DECLARATION OF JESSE GRANT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

kidnapping/torture case that I was investigating. Specifically, Bey IV wanted Longmire to ask why I was focusing on him not drug dealers in the community. Attached hereto as Exhibit A is a true and correct copy of the relevant portion of the letter that was provided to me during my kidnapping investigation.

16. During that same time period, I reviewed several phone calls from Bey IV that were recorded while he was in custody. In the calls that I reviewed there were many references to Sergeant Longmire and Bey's representations regarding his relationship with Sergeant Longmire remained consistent throughout.

17. On April 17, 2008, it became apparent that Lieutenant Ersie Joyner, a Homicide Lieutenant, was also upset with me for having raised concerns about Sergeant Longmire to Captain Loman. Lt. Joyner, in a raised voice and animated manner, expressed concern about the issues that I had previously raised with Loman regarding Sergeant Longmire and his connections with members of the Bakery.

18. Shortly thereafter, I informed Lieutenant Mike Yoell of the confrontation with Lieutenant Joyner. At that point, Lieutenant Yoell arranged a meeting with then Assistant Chief Jordan. A few days later, on approximately April 22, 2008, I attended a meeting with Assistant Chief Jordan, Deputy Chief Jeff Israel and Lieutenant Yoell. During that meeting, I expressed my concerns about the actions Sergeant Longmire had taken during the investigation of this case. I explained Sergeant Longmire's unusual interest in my kidnapping/torture case and suspects, his efforts to have property from my case released back to Bakery members, and Yusef Bey IV's statements concerning his relationship with Sergeant Longmire. I also informed them of my earlier conversations with Captain Loman and Lieutenant Joyner and their less-than-receptive response to my concerns about Sergeant Longmire.

19. My concerns about Sergeant Longmire were based on his conduct, such as inexplicably loitering near interviews of Bakery members and insisting that confiscated property be returned to Bakery members. My concerns were also based on the repeated statements made by Bakery member Yusef Bey IV that he had a relationship with Sergeant Longmire and had avoided

charges in the Bailey murder because of it. At the time I met with Assistant Chief Jordan in April 2008, I did not have any knowledge regarding Sergeant Longmire's religious affiliations. I did not nor have I ever believed that he is a Muslim. I did not nor have I ever believed that he is a Christian. In fact, I do not have any knowledge that he in fact has any religious beliefs at all. In addition, I did not nor have I ever believed that Sergeant Longmire was a member of the Bakery. My concern when I approached both Captain Loman and Assistant Chief Jordan was that Sergeant Longmire was or may have taken action which could or did negatively impact the investigation I was conducting.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 11th of August 2011, at Berkeley, California.

_____
JESSE GRANT

# EXHIBIT A

**Important**

Also if you could do me a favor an stay on Kellis, he is a good brother he's just weak, he let them devils make him think they could do what they want, have him explain to you what he did an tell him how to go about it. It is very important to my case.

Also if you could call Detective Longmire, he's a good friend an supporter of my father. My father also respected him, just ask him why the police Detective handling my case are protecting Drug dealers over helping us, after all we've done in the community. I already know the answer, however I want to put it on his conscious. His # is (510) 812-3850 identify yourself as the Chief of Security for the Bakery, tell him I gave you his number. Because I didn't want to call him from the jail phone.

Thank you Brother