MICHAEL W. FOSTER (State Bar No. 127691)
mfoster@fosteremploymentlaw.com
MADELYN G. JORDAN-DAVIS (State Bar No. 181771)
mjd@fosteremploymentlaw.com
C. CHRISTINE MALONEY (State Bar No. 226575)
cmaloney@fosteremploymentlaw.com
FOSTER EMPLOYMENT LAW
3000 Lakeshore Avenue
Oakland, California  94610
Telephone: (510) 763-1900
Facsimile: (510) 763-5952

BARBARA PARKER, City Attorney (State Bar No. 069722)
RANDOLPH W. HALL, Chief Assistant City Attorney (State Bar No. 080142)
VICKI A. LADEN, Supervising Deputy City Attorney (State Bar No. 130147)
CHRISTOPHER KEE, Deputy City Attorney (State Bar No. 157758)
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California  94612
Telephone: (510) 238-7686
Facsimile: (510) 238-6500

Attorneys for Defendants,
CITY OF OAKLAND, HOWARD JORDAN
and SEAN WHENT

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCSICO DIVISION**

| | |
|---|---|
| DERWIN LONGMIRE, | ) Case No. C 10-01465 JSW |
| Plaintiff, | ) (42 U.S.C. §§ 1981 and 1983) |
| vs. | ) |
| | ) **DECLARATION OF JOHN PORBANIC IN** |
| CITY OF OAKLAND, HOWARD | ) **SUPPORT OF DEFENDANTS' MOTION** |
| JORDAN, SEAN WHENT, and DOES 1- | ) **FOR SUMMARY JUDGMENT OR, IN** |
| 50, inclusive, | ) **THE ALTERNATIVE, PARTIAL** |
| | ) **SUMMARY JUDGMENT** |
| Defendant. | ) |
| | ) **Date:  December 9, 2011** |
| | ) **Time:  9:00 a.m.** |
| | ) **Dept:  Courtroom 11, 19th Floor** |
| | ) **Judge: Hon. Jeffrey S. White** |
| | ) |
| | ) Date Action Filed:  April 7, 2010 |
| | ) Trial Date:  February 27, 2012 |

**DECLARATION OF JOHN PORBANIC IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

I, John Porbanic, declare as follows:

1.      I am a Special Agent Supervisor with the California Department of Justice.  In late 2008 and early 2009, I conducted an administrative investigation of potential police officer misconduct for the Oakland Police Department involving Derwin Longmire, his supervisor Lieutenant Ersie Joyner and his manager Deputy Chief Jeffrey Loman.    I have personal knowledge of the following facts and am competent to testify about them.

2.      I have worked as an investigator for the California Department of Justice since 1999. The DOJ is periodically called upon by local agencies to conduct law enforcement related investigations where there are concerns of conflict of interest at the local level.  These investigations can be criminal or administrative in nature.  An administrative investigation focuses on violation of professional standards for police officers as opposed to violations of criminal law.

3.      In October 2008, former Oakland Mayor Ron Dellums requested that the DOJ conduct a parallel, concurrent  investigation involving the conduct of Oakland Police Department ("OPD") personnel who were responsible for investigating a high-profile murder:  the killing of journalist Chauncey Bailey.  Mayor Dellums' request to the DOJ followed intense scrutiny in the media of the Oakland Police Department's alleged missteps in the investigation of Bailey's murder and specifically the conduct of the lead homicide detective, Derwin Longmire, and Longmire's alleged relationship with murder suspect Yusef Bey IV.  I was assigned by DOJ Special Agent in Charge, Jeff Wall, to be the lead DOJ investigator into the allegations that Longmire, Joyner and Loman violated the OPD's Manual of Rules.  Initially, however, we determined that DOJ's role would be limited to monitoring OPD's progress on their administrative investigation, reviewing the completed work product, and recommending (or conducting, if we felt it necessary) any additional investigation that was needed in order to ensure that the investigation was complete and impartial. However, while our agency was not taking on responsibility at that time as the "lead" agency investigating the allegations, I was also empowered to conduct any independent investigation I felt necessary based on my review of the existing investigation.   At all times, DOJ operated entirely independently and received no direction or instructions from OPD regarding the manner in which we

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

were to conduct the investigation or the witnesses to be interviewed.  I had no prior involvement investigating OPD and I had no prior experiences or knowledge of Derwin Longmire.

4.     My first step was to become familiar with the investigation that had been conducted by OPD's Internal Affairs Division up to that time.  On November 12, 2008, I (and others from the DOJ team) met with OPD Sergeant Robert Chan from Internal Affairs.  Sergeant Chan provided me with 19 CD's containing voluminous amounts of evidence and information collected by the Internal Affairs Division and the IAD memoranda prepared to date pertaining to their own investigation.  I spent days reviewing and assimilating this information.  Although we were not attempting at that time to actively conduct the investigation for OPD as the lead agency, I was nevertheless empowered to do whatever was necessary in order to get completely up to speed on the matter, including contacting and interviewing any individuals or entities I believed necessary.

5.     On December 18, 2008, I (and others on the DOJ team) met with representatives from the Alameda County District Attorney's Office prosecuting the Bailey murder, including District Attorney Tom Orloff, Deputy District Attorney Chris Lameiro and their investigators Toni Sal and Kathy Boyavich.  Since a suspect had been arrested and a homicide prosecution was pending, we felt that a meeting with the D.A. was necessary since the fact of the now-public OPD investigation focused on alleged misdeeds by the lead detective handling the evidence that the D.A. would be presenting at trial.  The purpose of this meeting with the DA was to clarify our role, open a line of communication between the D.A. investigators and myself, and attempt to minimize any interference with the criminal prosecution by any investigation done by DOJ.  While we wanted to be able to communicate with the District Attorney's Office if absolutely necessary, we also felt it necessary to keep a very clear separation between the criminal and IA investigations and to minimize contact with the DA's office.   This is because peace officer internal affairs investigations, and compelled statements by public employees, are protected by law, including the *Lybarger* rules and the *Pitchess* protections afforded peace officer personnel records by statute and case law. The District Attorney investigators informed us Longmire had a history of lack of thoroughness and follow-up with his cases and they were doing a considerable amount of work on this case.  It was my impression that

DECLARATION OF JOHN PORBANIC IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

they were attempting to largely re-create the investigation so as to minimize Longmire's involvement at trial.   They did not know yet if they would pursue any type of criminal charges against Longmire, but whether or not to pursue such charges is within the province of the local prosecutor and DOJ would not step in unless it was requested to do so or determined that it was necessary to do so.

6.      On December 23, 2008, I (and others on the DOJ team), met with OPD Chief Tucker, OPD Captain Paulson, and City Attorney Rocio Fierro to determine the progress of their investigation.  They informed us their independent consultant Wendell (Pete) France would be completing the internal affairs investigation and would be done in approximately two weeks.  Based on that timetable, we believed that DOJ would be able to effectively review France's work and determine if any additional investigation was needed.  OPD informed us that it believed the time period to comply with the Public Safety Officer's Procedural Bill of Rights Act (Cal. Gov't Code § 3300) ("POBR") was April 17, 2009.

7.      Thereafter, I attempted to arrange a meeting with France to discuss his progress on his investigation.  Finally, on January 28, 2009, at 1000 hours, I was able to meet with France.  He stated he had run into problems completing the investigation and has not been able to complete the interviews he wanted to.  He informed me he had not made any real progress in the investigation.  I informed my chain of command.  At approximately 1600 hours on that same day, due to France's lack of progress and the impending POBR deadline, I was directed to take over the investigation and conduct an independent investigation.  We offered France the opportunity to participate with us in the investigation, which he never did.   We were now faced with a very short timeframe to complete the investigation, document it, have it reviewed and approved.  I immediately contacted OPD to arrange the scheduling of their personnel for interviews and began preparing for the interviews.  I independently decided which individuals to interview based upon my review of all case related information and selected individuals I believed had knowledge of all three subject's actions related to the allegations including peers in the homicide unit, supervisors and managers.  I conducted interviews for approximately two weeks between February 16, 2009, and February 26, 2009.  I

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

3

1    reviewed all of the interview transcripts and case related information and completed three

2    comprehensive reports as to my findings (one for each subject: Loman, Joyner, and Longmire). The

3    reports were reviewed by my chain of command for completeness and accuracy and I hand carried

4    them to Oakland City Attorney Rocio Fierro on April 2, 2009.    I determined that it appeared that

5    Longmire had violated OPD's Manual of Rules, but did not determine that any violation had been

6    committed by Joyner or Loman.

7         8.    One person that I interviewed was Assistant Chief Howard Jordan, and I interviewed

8    him because he was in Longmire's chain of command and thus presumably had knowledge of the

9    Bailey investigation. The only time I spoke with Chief Jordan was when I interviewed him. When I

10   prepared my list of witnesses, I was unaware of the race of most individuals. As it turns out, I

11   interviewed a racially diverse group of witnesses including five African Americans, one Hispanic,

12   one Caucasian, and one mixed-race individual. I also relied on some interviews conducted by

13   Sergeant Chan.

14        9.    I was never given any instruction by anyone at OPD or my superiors at DOJ as to the

15   expected or desired outcome of the investigation, nor did I have any predetermined outcome in

16   mind. The findings were my own, using my professional training and experience, in light of the

17   voluminous evidence I gathered. I applied a preponderance of the evidence standard. With respect

18   to my findings involving Longmire, I believed that the evidence demonstrated a violation of two of

19   the allegations: Performance of Duty and Compromising Criminal Cases. I did not believe that the

20   evidence demonstrated a violation of the following allegations: Obedience to Laws; Assisting

21   Criminals; Subversive Organizations.

22        As more fully detailed in my lengthy investigative report, as to the Performance of Duty

23   allegation, I found that Longmire failed to perform the duties of a competent homicide investigator

24   on the Bailey investigation in several respects including, but not limited to:

25   o   Longmire failed to include in his written homicide report vehicle tracking evidence that

26       Yusef Bey IV's vehicle was outside Bailey's house the night before the murder and near the

27       scene of the murder shortly after it occurred. Longmire further  refused Officer Huesman's

28

DECLARATION OF JOHN PORBANIC IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

FOSTER employment law
3000 Lakeshore Avenue
Oakland, California 94610

1  offer to prepare a supplemental report with this information.

2  ○ Longmire failed to include in his written homicide report evidence of a videotaped statement

3  obtained of Yusef Bey IV at the San Leandro Police Department on August 6, 2007, four

4  days after the murder, during which Bey IV described the location of the murder weapon the

5  night after the killing, where Bailey was shot on his body, how Bailey reacted to the

6  gunshots, and Bey IV's attribution to Longmire of the fact that the murder was not pinned on

7  Bey IV.

8  ○ Longmire failed to issue a warrant for cell-site records on Yusef Bey IV's cell phone to

9  determine if, when, and where he communicated with murder suspects Devaughndre

10  Broussard and/or Antoine Mackey.

11  ○ Longmire failed to diligently execute a search warrant for a cell phone belonging to Yusef

12  Bey IV by simply asking Bey IV's wife if she knew where it was.

13  ○ Longmire permitted Yusef Bey IV and Devaughndre Broussard to speak privately to each

14  other while in police custody and did not record the conversation.  Shortly after this

15  conversation, Broussard confessed to the murder.

16  ○ Longmire failed to document every communication he had with Yusef Bey IV while Bey IV

17  was incarcerated on other charges, despite a clear directive from his supervisor Joyner to do

18  so.

19  As more fully detailed in my lengthy investigative report, on Compromising a Criminal Case, I

20  found that Longmire interfered with the proper administration of criminal justice on the Bailey case

21  in several respects including, but not limited to:

22  ○ Longmire failed to remove himself as the lead homicide investigator in the Bailey murder

23  despite his relationship with Yusef Bey IV.

24  ○ Longmire took (or failed to take) investigative steps to avoid implicating Bey IV, described

25  above.

26  ○ Longmire permitted Bey IV to post an article on the www.freethebakerybrothers.org website

27  describing their relationship or friendship, and including Longmire's photo, while criminal

28

DECLARATION OF JOHN PORBANIC IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

1   charges were pending.

2   • Longmire intervened in a torture/kidnapping investigation involving the Bakery and tried to

3   have electronics seized during the Bakery raid in that case returned to Yusef Bey IV's wife.

4   10.    I did not conclude that Longmire was a "Black Muslim" or a member of "Your Black

5   Muslim Bakery" during my investigation, nor did I consider his religious beliefs in coming to the

6   conclusions outlined above.  For the reasons outlined above, I concluded that Longmire had a

7   relationship with Yusef Bey IV that interfered with his objectivity as a homicide investigator on the

8   Bailey case.   I did not consider Longmire's race in making these determinations.   In fact, I

9   determined that the evidence did not support a finding of a Manual of Rules violation for Joyner and

10  Loman, both African-Americans.

11  11.    I understand that Longmire has criticized my investigation for not discussing with the

12  prosecutors, during my investigation (and thus before the criminal trial of suspect Broussard),

13  whether or not they in fact happened to be aware of evidence that was excluded from the

14  investigative reports by Longmire.   I did not attempt any such determinations, for two reasons.

15  First, in my view, whether or not any given prosecutor may or may not happen to be aware of

16  information from another matter, it does not excuse a failure of an investigator to document

17  important information in investigative reports:  The identity of assigned investigators or prosecutors

18  may change, but information will never be lost if, instead of being left to oral history, it is

19  documented in the file and available to any subsequent investigator or prosecutor.  Thus, in my view,

20  it simply did not matter what the prosecutor thought about it:  Longmire should have documented the

21  information involving Bey IV, and his failure to do so, particularly in light of his relationship with

22  Bey IV, rose to the level of an OPD MOR violation, in my view.   Second, it puts a prosecutor in an

23  untenable position to ask the prosecutor his or her opinion about whether or not the lead police

24  investigator compromised a criminal case which the prosecutor is presently attempting to prosecute,

25  prior to a jury trial.   While there may be situations where this is necessary, this was not one of them,

26  in my view.

27

28

**DECLARATION OF JOHN PORBANIC IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

FOSTERemploymentlaw
3000 Lakeshore Avenue
Oakland, California 94610

1    I declare under penalty of perjury under the laws of the State of California and the United

2  States of America that the foregoing is true and correct.

3    Executed this 11th day of August 2011, at Sacramento, California.

4

5

6  JOHN PORBANIC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOHN PORBANIC IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT